# Exhibit A

**IN THE COURT OF COMMON PLEAS**
**COLUMBIANA COUNTY, OHIO**

KATHLEEN MCBRIDE,
710 N Market St
East Palestine, Ohio 44413,

and

DANNY MULLEN SR,
42692 Morris Rd.
Lisbon, Ohio 44432,

and

BRENDA MUNYON,
88 W Martin St.
East Palestine, Ohio 44413,

and

EVELYN MUNYON,
88 W Martin St.
East Palestine, Ohio 44413,

and

KRISTY MUNYON,
88 W Martin St.
East Palestine, Ohio 44413,

and

THEODORE MURPHY II,
51954 Darlington Rd
Negley, Ohio 44441,

and

JOSEPH MUSSER,
1946 Rauch Rd.
East Palestine, Ohio 44413,

and

MICHELLE MUSSER,

CASE NO.: 26CV572

JUDGE: SCOTT WASHAM

COMPLAINT

JURY DEMAND ENDORSED HEREON

FILED
COLUMBIANA COUNTY
COURT OF COMMON PLEAS
OCT 09 2026
ANTHONY J. DATTILIO
CLERK

1946 Rauch Rd.
East Palestine, Ohio 44413,

and

CHAD BROWN,
5466 Jimtown Rd
East Palestine, Ohio 44413,

and

MICHAEL MUSULIN,
5466 Jimtown Rd
East Palestine, Ohio 44413,

and

SHANNEN MYERS,
16575 Glenn St
East Liverpool, Ohio 43920,

and

CURTIS MAY,
273 Wood St
East Palestine, Ohio 44413,

and

BREANA NALESNIK,
273 Wood St.
East Palestine, Ohio 44413,

and

BRANDON NALESNIK,
407 Valley Rd.
Darlington, Pennsylvania 16115,

and

JOHN NALESNIK JR,
396 Valley Rd
Darlington, Pennsylvania 16115,

and

KIM NALESNIK,
396 Valley Rd
Darlington, Pennsylvania 16115,

and

BELINDA NECESSARY,
1136 Main Street, P.O Box 96
Enon Valley, Pennsylvania 16120,

and

ZACHARY NECESSARY,
1136 Main Street, P.O Box 96
Enon Valley, Pennsylvania 16120,

and

A.N., a minor, by and through
JOHN NELSON, parent and Next Friend,
278 Echo Valley Road
New Galilee, Pennsylvania 16141,

and

DEBORAH E NELSON,
278 Echo Valley Road
New Galilee, Pennsylvania 16141,

and

JOHN A NELSON,
278 Echo Valley Road
New Galilee, Pennsylvania 16141,

and

JOHN M NELSON,
278 Echo Valley Road
New Galilee, Pennsylvania 16141,

and

DIANA NICELY,
131 North Shadylane Dr.

East Liverpool, Ohio 43920, )
)
and )
)
BILLY J NOEL, )
3363 North Pleasant Drive )
East Palestine, Ohio 44413, )
)
and )
)
ROBIN NOEL, )
3363 North Pleasant Drive )
East Palestine, Ohio 44413, )
)
and )
)
APRIL NOLING, )
45288 Pine Hollow Rd. )
Rogers, Ohio 44455, )
)
and )
)
CHRISTOPHER OLDAKER, )
189 Wood St. )
East Palestine, Ohio 44413, )
)
and )
)
EDWARD ORR, )
4385 Lanterman Rd. )
Austintown, Ohio 44515, )
)
and )
)
THOMAS C MCGAHAN SR, )
319 Alice Street )
East Palestine, Ohio 44413, )
)
and )
)
HELEN MICHELE PARKER, )
464 Alice St )
East Palestine, Ohio 44413, )
)
and )
)

MEGAN PARKER,
535 Turnpike St
Beaver, Pennsylvania 15009,

and

TRINITY SCHNEIDER,
535 Turnpike St
Beaver, Pennsylvania 15009,

and

MORGAN PARKER,
468 Alice St
East Palestine, Ohio 44413,

and

C.W., a minor, by and through
MORGAN PARKER, parent and Next
Friend,
468 Alice St
East Palestine, Ohio 44413,

and

I.W., a minor, by and through
MORGAN PARKER, parent and Next
Friend,
468 Alice St
East Palestine, Ohio 44413,

and

DONALD BISHOP,
145 W Grant Street.
East Palestine, Ohio 44413,

and

SARA BISHOP,
145 W Grant Street.
East Palestine, Ohio 44413,

and

ANGELA PEEBLES,
145 W Grant Street.
East Palestine, Ohio 44413,

and

JOHN PERKINS,
241 Garfield Ave.
East Palestine, Ohio 44413,

and

MADISON PERKINS,
241 Garfield Ave.
East Palestine, Ohio 44413,

and

MIRANDA PERKINS,
241 Garfield Ave.
East Palestine, Ohio 44413,

and

SHERRI PERKINS,
241 Garfield Ave.
East Palestine, Ohio 44413,

and

MADISON PETERSON,
46739 Side Hill Rd.
East Liverpool, Ohio 43920,

and

JOHN PETRICH,
5461 Carbon Hill Rd.
East Palestine, Ohio 44413,

and

LISA PIERI,
143 Ridge Rd
Darlington, Pennsylvania 16115,

and )
)
JOSHUA PILLA, )
164 N. Howard Ave. )
Salem, Ohio 44460, )
)
and )
)
SHAWN PINKERTON, )
340 Hollow Vue Rd. )
Wampum, Pennsylvania 16157, )
)
and )
)
FRANK PIRTZ, )
959 State Route 534 NW )
Newton Falls, Ohio 44444, )
)
and )
)
NATHAN PIRTZ, )
959 State Route 534 NW )
Newton Falls, Ohio 44444, )
)
and )
)
SARAH PISANO, )
1010 Main St )
Enon Valley, Pennsylvania 16120, )
)
and )
)
JASON CRAWFORD, )
49471 State Route 154 )
Negley, Ohio 44441, )
)
and )
)
GINGER PITTS, )
49471 State Route 154 )
Negley, Ohio 44441, )
)
and )
)
NEVAEH PITTS, )
49471 State Route 154 )

Negley, Ohio 44441, )

and )

R.D., a minor, by and through )
LORI POSEY, parent and Next Friend, )
43716 State Route 558 )
Columbiana, Ohio 44408, )

and )

SARA DICKEY, )
43716 State Route 558 )
Columbiana, Ohio 44408, )

and )

TYLER DICKEY, )
43716 State Route 558 )
Columbiana, Ohio 44408, )

and )

LORI POSEY, )
43716 State Route 558 )
Columbiana, Ohio 44408, )

and )

BRANDON QUIMBY, )
1134 Eckert Rd )
Monaca, Pennsylvania 15061, )

and )

DAVID QUIMBY, )
1134 Eckert Rd )
Monaca, Pennsylvania 15061, )

and )

LAUREN QUIMBY, )
1134 Eckert Rd )
Monaca, Pennsylvania 15061, )

and )

TERESA QUIMBY, )
1134 Eckert Rd )
Monaca, Pennsylvania 15061, )

and )

A.R., a minor, by and through )
TERESA QUIMBY, parent and Next )
Friend, )
243 Cherry Hill Road )
Enon Valley, Pennsylvania 16120, )

and )

GABRIELLE HARRIS, )
203 West Clark St )
East Palentine, Ohio 44413, )

and )

JAHIRRA HARRIS, )
203 West Clark St )
East Palentine, Ohio 44413, )

and )

STEPHANIE QUINONES, )
203 West Clark St )
East Palentine, Ohio 44413, )

and )

EMMA RAINS, )
429 Calla Rd. )
Poland, Ohio 44514, )

and )

JAYDEN RAINS, )
429 Calla Rd. )
Poland, Ohio 44514, )

and )

JEREMY RAINS, )

429 Calla Rd. )
Poland, Ohio 44514, )
)
and )
)
SUSIE RAINS, )
429 Calla Rd. )
Poland, Ohio 44514, )
)
and )
)
CHRISTOPHER RALEY, )
223 West Clark St. )
East Palestine, Ohio 44413, )
)
and )
)
COLE RALEY, )
223 West Clark St. )
East Palestine, Ohio 44413, )
)
and )
)
E.R., a minor, by and through )
CHRISTOPHER RALEY, parent and Next )
Friend, )
223 West Clark St. )
East Palestine, Ohio 44413, )
)
and )
)
SHELBY WALLACE, )
60 S Washington St, Apt 34 )
East Palestine, Ohio 44413, )
)
and )
)
CHAD RATLIFF, )
420 East Main St )
East Palestine, Ohio 44413, )
)
and )
)
SAMANTHA RATLIFF, )
420 East Main St )
East Palestine, Ohio 44413, )

and )

CHRISTOPHER REED, )
1270 Shenango Road )
Darlington, Pennsylvania 16115, )

and )

ELIZABETH ZINZA, )
422 W Parkway St )
New Castle, Pennsylvania 16101, )

and )

DOROTHY REYNOLDS, )
7043 Vine St )
Enon Valley, Pennsylvania 16120, )

and )

JACK REYNOLDS, )
7043 Vine St )
Enon Valley, Pennsylvania 16120, )

and )

JASON REYNOLDS, )
7043 Vine St )
Enon Valley, Pennsylvania 16120, )

and )

NICHOLAS REYNOLDS, )
7043 Vine St )
Enon Valley, Pennsylvania 16120, )

and )

OWEN WEIGEL, )
451 Concord Circle Rd. )
Beaver Falls, Pennsylvania 15010, )

and )

TAYLOR GRACE WEIGEL, )

451 Concord Circle Rd.
Beaver Falls, Pennsylvania 15010,

and

MORGAN O KUBLER,
332 Alice St
East Palestine, Ohio 44413,

and

PAULA RICHARDS,
332 Alice Street
East Palestine, Ohio 44413,

and

JULIE RICHEAL,
419 E North Ave
East Palestine, Ohio 44413,

and

KEITH RICHEAL,
419 E North Ave
East Palestine, Ohio 44413,

and

AMANDA SUE LANNON,
419 East Clark Street
East Palestine, Ohio 44413,

and

CALLEIGH ELIZABETH RIMOLDI,
419 East Clark Street
East Palestine, Ohio 44413,

and

CHRISTOPHER EDWARD RIMOLDI,
419 East Clark Street
East Palestine, Ohio 44413,

and

CHRISTOPHER MICHAEL RIMOLDI,
419 East Clark Street
East Palestine, Ohio 44413,

Plaintiffs,

v.

M. ELIZABETH GRAHAM,
123 Justison Street, 7th Floor
Wilmington, Delaware 19801,

and

GRANT & EISENHOFER, P.A.,
123 Justison Street, 7th Floor
Wilmington, Delaware 19801,

and

SETH A. KATZ,
312 Walnut Street, Suite 2090
Cincinnati, Ohio 45202,

and

BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.,
312 Walnut Street, Suite 2090
Cincinnati, Ohio 45202,

and

JAYNE CONROY,
208 So. LaSalle Street, Suite 814
Chicago, Illinois 60604-1101,

and

JO ANNA POLLOCK,
208 So. LaSalle Street, Suite 814
Chicago, Illinois 60604-1101,

and

SIMMONS HANLY CONROY, )
c/o CT Corporate Systems )
208 So. LaSalle Street, Suite 814 )
Chicago, Illinois 60604-1101, )
)
and )
)
ADAM J. GOMEZ, )
123 Justison Street, 7th Floor )
Wilmington, Delaware 19801, )
)
and )
)
TUDOR I. FARCAS, )
123 Justison Street, 7th Floor )
Wilmington, Delaware 19801, )
)
and )
)
RUSSELL T. ABNEY, )
811 Barton Springs Road, Suite 725 )
Austin, Texas 78704, )
)
and )
)
MIKAL C. WATTS, )
811 Barton Springs Road, Suite 725 )
Austin, Texas 78704, )
)
and )
)
WATTS GUERRA LLP, )
811 Barton Springs Road, Suite 725 )
Austin, Texas 78704, )
)
and )
)
NICHOLAS T. AMATO, )
420 Broadway )
Wellsville, Ohio 43968, )
)
and )
)
AMATO LAW OFFICE, LPA, )
420 Broadway )
Wellsville, Ohio 43968, )

and )

ANDREW THOMPSON, )
23775 Commerce Park Road )
Beachwood, Ohio 44122, )

and )

SHAPERO ROLOFF CO., LPA, )
c/o Neil M. Tramer )
23775 Commerce Park Road )
Beachwood, Ohio 44122, )

and )

NEAL E. SHAPERO, )
3022 Glengary Road )
Shaker Heights, Ohio 44120, )

and )

JACKIE ROSE KRUGER, )
485 S. Robertson Boulevard, #4 )
Beverly Hills, California 90211, )

and )

KRUGER LAW FIRM, )
c/o Jackie Rose Kruger )
485 S. Robertson Boulevard, #4 )
Beverly Hills, California 90211, )

and )

VINCENT L. GREENE IV, )
5235 North Front Street )
Harrisburg, Pennsylvania 17110, )

and )

ROBERT HAEFELE, )
5235 North Front Street )
Harrisburg, Pennsylvania 17110, )

and )

JOHN D. HURST,
5235 North Front Street
Harrisburg, Pennsylvania 17110,

and

DENNIS A. COSTIGAN,
222 Jefferson Boulevard, Suite 200
Warwick, Rhode Island 02888,

and

JACOB R. STOUT,
5235 North Front Street
Harrisburg, Pennsylvania 17110,

and

MOTLEY RICE, LLC,
c/o Corporation Service Co.
5235 North Front Street
Harrisburg, Pennsylvania 17110,

and

DANIEL N. ABRAHAM,
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215,

and

MARK P. BRYANT,
601 Washington Street
Paducah, Kentucky 42003,

and

BRYANT LAW CENTER, P.S.C.,
c/o Mark P. Bryant
601 Washington Street
Paducah, Kentucky 42003,

and

T. MICHAEL MORGAN,

329 Park Avenue North, 2nd Floor )
Winter Park, Florida 32789, )
)
and )
)
MORGAN & MORGAN, P.A., )
c/o WHWW, Inc. )
329 Park Avenue North, 2nd Floor )
Winter Park, Florida 32789, )
)
and )
)
GALE PEARSON, )
10601 Clarence Drive, Suite 250 )
Frisco, Texas 75033, )
)
and )
)
NACHAWATI LAW GROUP, PLLC, )
c/o Legalinc Corporate Services, Inc. )
10601 Clarence Drive, Suite 250 )
Frisco, Texas 75033, )
)
and )
)
EAST PALESTINE JUSTICE, )
319 North Main Street )
Columbiana, Ohio 44408, )
)
and )
)
ARCH I. CARSON, M.D., Ph.D., )
3998 Annwood Street )
Cincinnati, Ohio 45206, )
)
and )
)
ARCH CARSON, M.D., INC., d/b/a )
ENVIRONMENTAL MEDICINE )
CONSULTANTS, )
3998 Annwood Street )
Cincinnati, Ohio 45206, )
)
and )
)
REBUTTAL PR, INC., )

500 Paterson Plank Road )
Union City, New Jersey 07087, )
)
and )
)
STEPHANIE WOLF, )
500 Paterson Plank Road )
Union City, New Jersey 07087, )
)
and )
)
JOHN AND JANE DOE(S) 1 THROUGH )
50, inclusive, )
person(s), law firm(s), professional )
association(s), corporation(s), or other )
entity(ies) involved in the events )
described below. True name(s) and )
address(es) unknown. )
)
Defendants.

## COMPLAINT

Now come Plaintiffs, by and through undersigned counsel, and state as follows for their Complaint against the above-named Defendants:

### I. PRELIMINARY STATEMENT

1. This is an action by residents of East Palestine, Ohio and the surrounding communities against the lawyers who were appointed to protect them and against the physician whose assurances persuaded them to sign away the right to be compensated for diseases they had not yet developed.

2. On February 3, 2023, a Norfolk Southern train carrying more than 1,600,000 pounds of hazardous chemicals derailed in the Village of East Palestine. Three days later, tank cars of vinyl chloride were breached and burned in a deliberate release that sent a plume of combustion products over the community. Writing separately in the appeal from the fee award in the ensuing class action, a judge of the United States Court of Appeals for the Sixth Circuit described that release as having exposed over half a million residents in East Palestine and nearby towns to toxic fumes and environmental hazards. Notice of the class settlement was later mailed to 371,778 residents and 13,739 businesses.

3. The lawyers who came to represent those people obtained a settlement of $600,000,000. They were awarded $162,000,000 in fees and approximately $18,000,000 in expenses. Under a provision of their own settlement agreement, their fees were payable into escrow within 14 days of final approval. Their clients waited years.

4. This case is not about the size of that settlement, and Plaintiffs do not ask this Court to disturb it. This case is about a second betrayal, layered on top of the first, in which Plaintiffs surrendered something the class settlement did not require them to surrender.

5. The settlement contained an optional component. A class member living within 10 miles of the derailment site could elect to receive an additional payment (in addition to their property damage claim) in exchange for a release of all personal injury claims arising from the derailment, including claims for diseases that had not yet appeared and would not appear for years or decades. Nobody was required to sign it. Plaintiffs signed it based on the advice and actions of their lawyers.

6. They signed it because they were told there was nothing to be afraid of.

7. On August 1, 2024, at a virtual town hall convened for class members, a video was played. In it, a physician and toxicologist named Arch Carson told the assembled residents that there would not be any long-term health impact from the derailment, that he would not personally expect one person to develop a cancer as a result of the exposure, and that the community could be predicted to be safe in the long term. He was introduced to the audience as a person not involved in the litigation and as a completely independent third party.

8. Defendant Carson was not the independent third party he was represented to be. Six days before the town hall, a public relations firm retained in connection with the class litigation circulated the edited video to two members of Lead Class Counsel and to two other class counsel, addressing the message to Dr. Carson and stating that with his approval it would be shared at the virtual town hall. One of the lawyers on that distribution forwarded the message with the instruction that it not be distributed before the town hall. The video file itself bore a name identifying it as a video prepared for two of the class counsel.

9. At the same time that Dr. Carson was telling class members to expect no long-term health effects, counsel possessed the work of an exposure expert they had themselves retained, whose conclusions they did not share with the class, and who was bound by a

confidentiality obligation they enforced. When that expert's data was made public in August and September of 2026, it showed that between 50 percent and 70 percent of the data points for dioxins or polycyclic aromatic hydrocarbons exceeded screening levels for cancer.

10. Twenty days after the video was shown, counsel signed and submitted, on behalf of another class member, a claim statement reciting that the Director of the Occupational Lung Disease Program at the Cleveland Clinic had diagnosed that class member with a respiratory injury caused by the derailment and was prepared to testify to that causation.

11. In July 2024, with the rate of election low enough to place the certification and settlement in jeopardy, counsel raised the advertised personal injury payment by 150 percent, from $10,000 to $25,000, and falsely told the community that the increase reflected estimates that had proven conservative. Claim volume rose from roughly 2,500 to roughly 30,000. The money behind the promise did not increase in proportion. When the volume the promise produced exceeded the money set aside for it, the value of each claim was reduced, and the releases remained irrevocable.

12. Plaintiffs do not herein seek rescission of their releases. They do not ask this Court to vacate, reallocate, or reopen any order of any other court, and no relief sought in this Complaint runs against the settlement fund. What Plaintiffs pursue is the personal liability of the lawyers, physician, and the others who caused them to sign.

## II. PARTIES

### A. Plaintiffs

13. Plaintiffs are individual residents and former residents of East Palestine, Ohio and the surrounding communities in Columbiana County, Ohio, each of whom is identified by name and residence in the caption of this Complaint.

14. Fewer than 100 persons are named as Plaintiffs in this Complaint.

15. Each Plaintiff was a member of the settlement class certified in *In re East Palestine Train Derailment*, Case No. 4:23CV0242, in the United States District Court for the Northern District of Ohio.

16. Each Plaintiff elected to participate in the Voluntary Exposure component of that settlement and executed a personal injury release.

17. Certain Plaintiffs sue in a representative capacity on behalf of minor children whose releases were executed by a parent or guardian.

**B. Attorney Defendants**

18. Defendant M. Elizabeth Graham is an attorney admitted pro hac vice in the class action and at all relevant times was a director of Defendant Grant & Eisenhofer P.A. She served as Lead Class Counsel. She made the statements to the United States District Court described *infra*, and she was the recipient of the communication from the public relations firm described *infra*.

19. Defendant Grant & Eisenhofer P.A. is a professional association with its principal office in Wilmington, Delaware. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

20. Defendant Seth A. Katz is an attorney admitted pro hac vice in the class action and at all relevant times was a shareholder of Defendant Burg Simpson Eldredge Hersh & Jardine, P.C. He served as Lead Class Counsel. He was among the recipients of the communication from the public relations firm described *infra*. He participated in negotiating the environmental sampling protocol described infra, and spoke at the August 1, 2024 town hall.

21. Defendant Burg Simpson Eldredge Hersh & Jardine, P.C. is a professional corporation with its principal office in Englewood, Colorado. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

22. Defendant Jayne Conroy is an attorney admitted pro hac vice in the class action and at all relevant times a principal of Defendant Simmons Hanly Conroy. She served as Lead Class Counsel. Her firm was the firm that first retained the exposure expert described *infra*. Upon information and belief, she participated in the leadership decisions described in this Complaint, including the decision to enforce the confidentiality obligation against that expert, the decision to present Defendant Carson to the class, and the decision to increase the advertised personal injury payment.

23. Defendant Jo Anna Pollock is an attorney licensed in the State of Illinois, Illinois Registration No. 6273491, admitted to practice in that State on November 9, 2000, and admitted pro hac vice in the Class Action on motion filed February 20, 2023. At all relevant times she was a lawyer at Defendant Simmons Hanly Conroy. She authored and signed the letter of June 28, 2023 by which counsel for the class gave notice to Norfolk Southern that the class would collect soil samples in and around East Palestine, offered split and duplicate sampling, and requested a sampling protocol, copying Defendant Conroy, Defendant Katz, and Defendant Graham.

24. Defendant Simmons Hanly Conroy is a law firm with its principal office in New York, New York. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

25. Defendant Adam J. Gomez is an attorney and at all relevant times was a lawyer at Defendant Grant & Eisenhofer P.A. Upon information and belief, he communicated with the settlement administrator daily or nearly daily. He announced the revised payment figure at the

August 1, 2024 town hall, and he was among the recipients of the communication from the public relations firm described *infra*.

26. Defendant Tudor I. Farcas is an attorney and at all relevant times was a lawyer at Defendant Grant & Eisenhofer P.A. He supervised the environmental sampling program conducted on behalf of the class. On July 18 and 19, 2023, he personally accompanied one of the two sampling teams to 51 locations in and around East Palestine, and on August 16, 2023, he accompanied the team to the properties of the 15 class representatives and to a background location. He swore to those facts in a declaration filed in the Class Action on January 4, 2024. The results of that sampling program are the data described, *infra*.

27. Defendant Russell T. Abney is an attorney and at all relevant times was a lawyer at Defendant Watts Guerra LLP, which also practices as Watts Law Firm LLP. He was among the recipients of the communication from the public relations firm described *infra* and directed the timing of the video's release.

28. Defendant Mikal C. Watts is an attorney and at all relevant times was a principal of Defendant Watts Guerra LLP. He was appointed to the Plaintiffs' Executive Committee in the class action by order entered April 5, 2023. Upon information and belief, he and Defendant Abney together signed extraordinary injury claim submissions in the class action, including the claim statement described *infra*.

29. Defendant Watts Guerra LLP is a law firm with offices in Texas that solicited and represented East Palestine residents. Upon information and belief, it operated a storefront office in Columbiana, Ohio for that purpose. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

30. Defendant Nicholas T. Amato is an attorney licensed in the State of Ohio, and at all relevant times a lawyer at Defendant Amato Law Office, LPA of Wellsville, Columbiana County, Ohio. He was appointed Community Liaison Counsel in the Class Action by order entered April 5, 2023.

31. Defendant Amato Law Office, LPA is an Ohio legal professional association with its principal office at 420 Broadway Avenue, Wellsville, Columbiana County, Ohio. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

32. Defendant Andrew Thompson is an attorney licensed in the State of Ohio, Ohio Registration No. 0071530, and at all relevant times was a lawyer at Defendant Shapero Roloff Co., LPA. He signed and filed the complaint of February 7, 2023 that became the lead case in the Class Action, and he filed the first amended class action complaint on February 20, 2023. In February and March of 2023, he filed the motions by which Defendant Conroy, Defendant Pollock, and other counsel from outside this State were admitted pro hac vice in that action.

33. Defendant Neal E. Shapero is an attorney licensed in the State of Ohio since 1984, and at all relevant times a shareholder and director of Defendant Shapero Roloff Co., LPA. He was appointed to the Plaintiffs' Steering Committee in the Class Action by order entered April 5, 2023. He is counsel of record on the complaint filed February 7, 2023 that became the lead case in that action.

34. Defendant Shapero Roloff Co., LPA is an Ohio legal professional association with its office of record at 1111 Superior Avenue East, Suite 1310, Cleveland, Ohio. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

35. Defendant Jackie Rose Kruger is an attorney, and at all relevant times was a lawyer at Defendant Kruger Law Firm of Beverly Hills, California.

36. Defendant Kruger Law Firm is a law firm with its principal office at 485 South Robertson Boulevard, Beverly Hills, California. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

37. Defendant Vincent L. Greene IV is an attorney licensed in the State of Rhode Island, and at all relevant times a member of Defendant Motley Rice LLC. He was appointed to the Plaintiffs' Executive Committee in the Class Action by order entered April 5, 2023. He applied for that appointment by letter to the Court dated March 10, 2023, in which he represented that his firm had two class cases pending before that Court and represented hundreds of clients affected by the derailment.

38. Defendant Robert Haefele is an attorney and at all relevant times a lawyer at Defendant Motley Rice LLC.

39. Defendant John D. Hurst is an attorney and at all relevant times a lawyer at Defendant Motley Rice LLC, practicing from that firm's office at 50 Clay Street, Suite 1, Morgantown, West Virginia. He entered his appearance for the plaintiffs in the Class Action on July 11, 2023.

40. Defendant Dennis A. Costigan is an attorney admitted pro hac vice in the Class Action and at all relevant times a lawyer at Defendant Motley Rice LLC. He was counsel of record for the plaintiffs on the appearances filed July 11, 2023, and he appeared for the plaintiffs at the discovery conference held November 29, 2023.

41. Defendant Jacob R. Stout is an attorney admitted to the bar of the United States District Court for the Northern District of Ohio under identification number PA328135, and at all relevant times a lawyer at Defendant Motley Rice LLC. He entered his appearance for the plaintiffs in the Class Action on July 11, 2023.

42. Defendant Motley Rice, LLC is a law firm with offices in several states that solicited and represented East Palestine residents. It filed two of the actions consolidated into the Class Action. Upon information and belief, it represented hundreds of clients affected by the derailment and conducted town hall meetings for them together with its Ohio co-counsel. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

43. Defendant Daniel N. Abraham is an attorney licensed in the State of Ohio, and appeared in the Class Action as counsel for dozens of members.

44. Defendant Mark P. Bryant is an attorney licensed in the Commonwealth of Kentucky, admitted pro hac vice in the Class Action on February 17, 2023, and at all relevant times the founding member of Defendant Bryant Law Center, P.S.C. His firm held 863 individual retainer agreements with class members. He has sworn that his firm was centrally responsible for the retainer arrangements at the outset of the matter, communicated with those clients throughout, took the lead in assisting them as they decided whether to remain in the class, acted as a claims center through a portal the settlement administrator opened for it, and met with clients in their homes and businesses and in town hall meetings. He filed a declaration supporting final approval of the settlement, the plan of distribution, and the fee request.

45. Defendant Bryant Law Center, P.S.C. is a Kentucky professional service corporation with its principal office at 601 Washington Street, Paducah, Kentucky. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

46. Defendant T. Michael Morgan is an attorney licensed in the State of Florida and in no other state, admitted pro hac vice in the Class Action, and at all relevant times a principal of Defendant Morgan & Morgan, P.A. By order entered April 5, 2023, he was appointed Co-

Lead Counsel in the Class Action. He signed the Settlement Agreement as Co-Lead Counsel, and he filed a declaration supporting final approval of the settlement and the fee request.

47. Defendant Morgan & Morgan, P.A. is a Florida professional association with its office of record at 20 North Orange Avenue, Suite 1600, Orlando, Florida. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

48. Defendant Gale Pearson is an attorney and a partner of Defendant Nachawati Law Group, PLLC.

49. Defendant Nachawati Law Group, PLLC is a law firm with an office at 10601 Clarence Drive, Suite 250, Frisco, Texas. It is named for the conduct of its principals and associates and on the principle of respondeat superior.

50. Defendant East Palestine Justice is the name under which four law firms collectively solicited and represented East Palestine residents. Defendant Watts has sworn that Defendant Watts Guerra LLP, together with Watts Law Firm LLP, Bevan & Associates, LPA, Inc. of Ohio, Sunridge Law Group, LLC of Arizona, and the Law Office of Douglas Boxer of California, partnered to work collectively under that moniker. East Palestine Justice maintained a mailing address at 319 North Main Street, Columbiana, Ohio. Upon information and belief, it is a trade name and not a separate legal entity, and the firms and attorneys who composed it are liable for the conduct carried on under that name.

51. The Defendants identified in the preceding paragraphs are referred to collectively as the Attorney Defendants.

52. The lawyers and law firms appointed to leadership positions in the class action, and those who acted at their direction in the conduct of that action, are referred to in this Complaint as class counsel. Not every person who was class counsel is a Defendant in this

action, and not every Attorney Defendant held a leadership appointment. Where this Complaint alleges an act of class counsel without naming the individual who performed it, Plaintiffs allege that the act was performed by one or more of the Attorney Defendants, or at their direction, and that the identity of the individual is presently known only to Defendants.

### C. Expert and Public Relations Defendants

53. Defendant Arch I. Carson, M.D., Ph.D., is a physician and toxicologist residing in Cincinnati, Ohio, and is the principal of Defendant Environmental Medicine Consultants. He is board certified in occupational medicine. His curriculum vitae, dated October 10, 2023, states that he obtained a certificate of board eligibility in medical toxicology in 2002, and it reflects no certification in that specialty in the 21 years that followed.

54. Defendant Environmental Medicine Consultants is an entity through which Defendant Carson provides consulting services, with its principal place of business in Cincinnati, Ohio. Defendant Carson acted within the scope of his role as its principal in the conduct described infra, and it is named for his conduct and on the principle of respondeat superior.

55. Defendant Rebuttal PR is a public relations firm retained by class counsel in connection with the class action settlement. It recorded, edited, and produced the video described infra. It is named for the conduct of its principals and employees and on the principle of respondeat superior.

56. Defendant Stephanie Wolf is, upon information and belief, a principal or employee of Defendant Rebuttal PR and the author of the July 26, 2024 communication described infra.

### D. Doe Defendants

57. Defendants John and Jane Doe 1 through 50 are persons, law firms, professional associations, or other entities whose identities are presently unknown to Plaintiffs and who participated in the conduct described in this Complaint, including law firms that received a share of the fee award described *infra*. Their true names and addresses are unknown to Plaintiffs, they are designated in the caption and in this Complaint as name unknown, the summons issued as to each is to bear that endorsement, and Plaintiffs will seek leave to amend when their identities are ascertained.

### E. Defined Terms

58. The following terms are used in this Complaint as follows:

a. The "Class Action" means *In re East Palestine Train Derailment*, Case No. 4:23CV0242, in the United States District Court for the Northern District of Ohio;

b. The "Settlement Agreement" means the agreement executed on or about April 26, 2024, by which that action was resolved, together with its exhibits;

c. The "Settlement Fund" means the fund of $600,000,000 created by the Settlement Agreement;

d. The "Voluntary Exposure Component" means the optional component of the settlement described *infra*, by which a class member residing within 10 miles of the derailment site could elect an additional payment in exchange for a release of personal injury claims;

e. The "Personal Injury Release" means the instrument by which a class member made that election.

59. The Personal Injury Releases, the Settlement Agreement, the plan of distribution, the notice materials, and the written questions and answers described in this Complaint are not attached. The releases executed by Plaintiffs are in the possession of the settlement administrator and of Norfolk Southern Railway Company. The Settlement Agreement, the plan of distribution, and the notice materials are filed on the public docket of the Class Action.

## III. JURISDICTION AND VENUE

60. This Court has subject matter jurisdiction as Plaintiffs' claims arise under the statutory and common law of the State of Ohio and the amount in controversy exceeds the jurisdictional minimum of this Court.

61. This Court has personal jurisdiction over each Defendant pursuant to Ohio Revised Code ("R.C.") § 2307.382 and consistent with due process. As to each Defendant, one or more of the following is true, and Plaintiffs plead them in the alternative: the Defendant transacted business in this State; the Defendant contracted to supply services in this State; the Defendant caused tortious injury by an act or omission in this State; the Defendant caused tortious injury in this State by an act outside this State while regularly soliciting business and deriving substantial revenue from services rendered in this State; and/or the Defendant caused tortious injury by a criminal act, elements of which took place in this State.

62. Venue is proper in this Court pursuant to Civ.R. 3(C)(3) and Civ.R. 3(C)(6). The solicitation of Plaintiffs and provision of legal services, the community meetings, the operation of the settlement center at 191 East Rebecca Street in East Palestine, the dissemination of the video and written materials described *infra*, and the execution of the releases all occurred in Columbiana County, and all or part of the claims for relief arose in Columbiana County.

63. This is an action for professional liability and intentional tortious conduct arising from the conduct of counsel and of a physician who addressed the class at counsel's behest. It is not an action arising from the derailment itself, and it does not seek any recovery from Norfolk Southern Railway Company.

64. Plaintiffs do not propose, and each Plaintiff expressly disclaims any proposal, that their claims be tried jointly with the claims of any other person. Each Plaintiff asserts individual claims arising from individual communications, individual reliance, and individual injury, and each seeks a separate judgment. All claims pleaded here arise from an event(s) that occurred in this State and from injuries suffered in this State.

## IV. THE DUTIES OWED

### A. The Attorney as Fiduciary

65. The relationship between a lawyer and a client is a fiduciary relationship. It imposes on the lawyer the duties of undivided loyalty, of candor, and of full disclosure, and it requires the lawyer to place the interests of the client above the interests of the lawyer.

66. Those duties are not suspended because a client is one of many. A lawyer appointed to represent a class represents every member of it. The absent class member, who has no ability to supervise counsel, who often does not know counsel's name, and whose only protection is the fidelity of a lawyer he or she did not choose, is owed the same loyalty as the client who walks into a law office and signs a fee agreement.

67. The class action was designed to give the injured a remedy they could not obtain alone. It was not designed to convert them into a source of fees.

### B. The Structural Conflict, and the Law's Response

68. Courts and commentators have recognized for decades that the class device creates a structural conflict. Counsel's fee is paid from the same fund that compensates the class.

Counsel's interest is in the size of the fee and the speed of its payment. The class's interest is in the size of the recovery and the adequacy of the disclosure that precedes it. Those interests diverge, and when they do the class has no practical means of protecting itself.

69. The law's answer has been to require that counsel be policed and that counsel's disclosures be complete. The United States Court of Appeals for the Sixth Circuit has stated that the law relies upon the fiduciary obligations of the class representatives and, especially, class counsel, to protect the interests of absent class members, and has warned courts to be vigilant for subtle signs that class counsel have allowed the pursuit of their own interests to infect the negotiations, including the danger that the lawyers might urge a class settlement at a low figure or on a less than optimal basis in exchange for favorable treatment on fees.

**C. The Ohio Rules of Professional Conduct as Evidence of the Standard of Care**

70. The Ohio Rules of Professional Conduct do not create a private cause of action. They define what a reasonable lawyer must do, and they are pleaded here as evidence of the standard of care and of the public policy of this State.

71. Prof.Cond.R. 1.7 and 1.8 prohibit a lawyer from representing a client when the representation involves a concurrent conflict of interest, and prohibit transactions with a client in which the lawyer holds an adverse interest.

72. Prof.Cond.R. 1.8(g) provides that a lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of those clients unless each client gives informed consent in a writing signed by the client, and unless counsel discloses the existence and nature of all the claims involved and the participation of each person in the settlement.

73. Prof.Cond.R. 1.4 requires a lawyer to keep the client reasonably informed about the status of the matter and to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

74. Prof.Cond.R. 1.5 requires that a lawyer's fee be reasonable, that a contingent fee agreement be in a writing signed by the client, and that the lawyer provide a written statement at the conclusion of the matter.

75. Prof.Cond.R. 7.1 through 7.3 prohibit false or misleading communications about a lawyer or the lawyer's services and regulate the solicitation of clients.

76. Prof.Cond.R. 8.4 provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

**D. The Relationship Between these Plaintiffs and the Attorney Defendants**

77. An attorney-client and fiduciary relationship existed between each Plaintiff and each of the Attorney Defendants.

78. That relationship was not a formality. The Attorney Defendants solicited Plaintiffs through a campaign conducted by mail, by broadcast, online, and in person, as described *infra*. They convened town hall meetings for Plaintiffs and answered Plaintiffs' questions. They staffed a settlement center in East Palestine at which class members met with class counsel attorneys. They advised Plaintiffs what their claims were worth. They signed and submitted individual injury claim statements on class members' behalf.

79. Attorney Defendants and the Doe Defendants entered into agreements with one another, written or otherwise, for the common purpose of litigating the claims of the class, pooled their resources and personnel in that common undertaking, and shared in the fee awarded

for it, and they are jointly and severally liable for the conduct of the joint undertaking to the persons on whose behalf it was conducted.

80. Each Attorney Defendant acted with malice, in that each acted with fraud, bad faith, collusion, and/or other conduct undertaken for that Defendant's own benefit and in conscious disregard of the legal rights of the persons that Defendant was appointed or engaged to represent and protect.

## V. FACTUAL ALLEGATIONS

### A. The Derailment

81. On the evening of February 3, 2023, a Norfolk Southern train derailed in the Village of East Palestine, Columbiana County, Ohio. 52 cars carrying 24 different products left the tracks, of which 8 products were carcinogens, including vinyl chloride.

82. Fires burned for days. On February 6, 2023, tank cars of vinyl chloride were deliberately breached and the contents burned, producing a plume of combustion products that was carried over the community. The cars designated on the Norfolk Southern manifest as burned contained 5,330,000 pounds of materials and the cars listed as impinged contained an additional 3,220,000 pounds. A temperature inversion on the day of the derailment held the plume to an altitude of approximately 3,000 feet, where it spread over a large area. Many, but not all, residents were evacuated.

83. The derailment and the burn released, among other substances, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether, and produced combustion byproducts including chlorinated dioxins, chlorinated dibenzofurans, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, phosgene, hydrogen chloride, acrolein, and particulate soot.

84. The United States Court of Appeals for the Sixth Circuit recorded that more than 54,000 households within the 20 mile radius had filed claims, that 0.18 percent of eligible households and 0.31 percent of eligible businesses opted out, and that 86 of approximately half a million eligible class members filed timely objections.

**B. The Class Action and the Settlement**

85. Dozens of actions were filed. On April 5, 2023, the United States District Court for the Northern District of Ohio consolidated them under the caption *In re East Palestine Train Derailment*, Case No. 4:23CV0242, and appointed Defendant Graham, Defendant Katz, and Defendant Conroy as Lead Class Counsel, Defendant Watts to the Plaintiffs' Executive Committee, and others to additional leadership positions.

86. On April 9, 2024, class counsel and Norfolk Southern reached a settlement in principle. The Settlement Agreement was executed on or about April 26, 2024. It created a non-reversionary fund of $600,000,000 and defined the class to include all persons residing, owning or otherwise having a legal interest in property, working, or owning or operating a business within a 20 mile radius of the derailment site.

87. Three weeks before the settlement in principle, on March 18, 2024, class counsel and the defendants in that action jointly moved to extend the deadline by which plaintiffs' expert witnesses were required to be designated. The deadline was extended. The settlement followed. No plaintiffs' expert was ever designated. No plaintiffs' expert report was ever exchanged. Of approximately 70 depositions taken in the class action, none involved an expert of any kind.

88. The settlement consisted of two components. A Direct Payment component compensated property and economic loss within the 20 mile zone. A separate and optional component, called the Voluntary Exposure Component, offered an additional payment to class

members within 10 miles of the site who agreed to release all claims for personal injury arising from the derailment.

89. The release of personal injury claims was the only claim the class settlement did not release automatically. A class member had to elect it. The release, on its face, extended to injuries and diseases that had not manifested and would not manifest for years or decades.

### C. The Termination Thresholds

90. The Settlement Agreement was accompanied by a confidential Supplemental Termination Agreement. Section XI.C of the Settlement Agreement provided Norfolk Southern the unilateral right to terminate the settlement if the rate at which class members participated triggered numerical thresholds.

91. Those thresholds were not disclosed to the class. Class members were not told that their individual decisions whether to sign a release bore on whether the settlement would survive at all.

92. The settlement administrator understood that if claim rates dropped below the thresholds set forth in that nonpublic agreement, Norfolk Southern would gain the unilateral right to terminate the settlement in its entirety, ***including the fees payable to class counsel.***

93. The consequence was that the settlement, and therefore the fee, depended on the number of class members who could be persuaded to release their personal injury claims. The Attorney Defendants had a direct and undisclosed financial interest in the answer to a question they were advising their clients how to decide.

### D. The Solicitation and Notice Campaign

94. Beginning in February 2023, and continuing thereafter, the Attorney Defendants and firms associated with them solicited East Palestine residents as clients through advertising,

mailings, informational meetings, town hall meetings, and storefront offices operated in and around Columbiana County.

95. After preliminary approval, a notice campaign was conducted under the supervision of the court and at the direction of class counsel. On May 30, 2024, notices and claim forms were mailed to 371,778 residents and 13,739 businesses. A dedicated settlement website went live on May 31, 2024, and had received 164,292 unique visitors as of June 11, 2025. A telephone line that callers could use without charge received 70,799 calls. More than 650,000 online display advertisements were placed. More than 2,800,000 social media impressions were delivered. More than 2,200 commercials ran on local network and cable television.

96. On July 9, 2024, reminder postcards were mailed to 187,697 class members and reminder electronic mail messages were sent to 197,763 class members. On July 31, 2024, a second reminder electronic mail message was sent to 105,968 class members. On August 2, 2024, a second reminder postcard was mailed to 279,190 class members.

97. The notice program was represented to have reached approximately 99 percent of all class members.

98. A settlement center opened at 191 East Rebecca Street in East Palestine on June 3, 2024. Class members visiting the center met with staff of the settlement administrator or with one of the class counsel attorneys. More than 11,000 class members visited the center, and more than 7,600 claim forms were submitted.

**E. The Increase from $10,000 to $25,000**

99. Initially, the personal injury release forms that class members were given recited that the average payment would be approximately $10,000 for a class member residing within 0

to 2 miles of the derailment site, approximately $5,000 for a class member residing within 2 to 5 miles, and approximately $1,000 for a class member residing within 5 to 10 miles.

100. By late July 2024, the rate at which class members were electing the personal injury component was low.

101. On July 22, 2024, Defendant Graham communicated to the settlement administrator that the low rate of election of the personal injury component was placing the settlement in jeopardy. At the direction of class counsel, the settlement center expanded its hours to six days per week.

102. On or about July 24, 2024, class counsel and Norfolk Southern agreed to increase the represented base personal injury payment by 150 percent, from $10,000 to $25,000. The settlement administrator was not consulted. At the time of that decision, 2,546 personal injury claims had been received.

103. The revised figures were represented by distance as approximately $25,000 for the Village of East Palestine and the area within 0 to 2 miles, approximately $15,000 for the area within 2 to 5 miles, approximately $5,000 for the area within 5 to 7 miles, and approximately $2,000 for the area within 7 to 10 miles.

104. The Chief Operating Officer of the settlement administrator cautioned Defendant Gomez that a sudden change of that magnitude might not be the best approach, and was told by class counsel that the underlying calculations supporting the decision had been checked backwards and forwards.

105. Pamphlets reflecting the revised amounts were distributed throughout East Palestine. The pamphlets represented to class members that, based upon claim filings as of that

time, it appeared that early preliminary estimates had proven to be conservative and that a greater per person personal injury payment would be available.

106. Class counsel encouraged the staff of the settlement administrator, at the settlement center, to stress the revised amounts to class members.

107. The printed materials were never corrected. They continued to recite the original figures. The settlement administrator requested permission to print and distribute revised release forms reflecting the new amounts, and class counsel directed the administrator not to do so.

108. The result was that class members were asked to sign an instrument reciting one set of figures while being told, in writing and in person, that a different and higher set of figures would apply.

109. At the town hall meeting of August 1, 2024, Defendant Gomez told class members that the personal injury payments were being revised, in his words, up to the tune of $25,000 per person in East Palestine.

110. The plan of distribution approved by the court, to which class members were directed, provided that all eligible class members start with a base of 100 points, that the base of 100 points is equivalent to a $25,000 share of the Voluntary Exposure Component, and that the base case is therefore entitled to $25,000 per person, with other individuals' payments increasing or decreasing from the base case depending on the factors presented in their claim forms.

111. The same plan of distribution carried a footnote stating that the point value was to be determined and was stated for illustrative purposes only. Yet, no class member was told that the figure represented to that class member in the pamphlets, at the settlement center, and at the town hall was illustrative. Time and time again, Defendant Attorneys told Plaintiffs they would received at least $25,000.

112. Personal injury claims rose from 2,546 in late July 2024 to approximately 30,000 by the close of the claim period on August 22, 2024.

113. The money allocated to the Voluntary Exposure Component did not increase in proportion.

**F. The Video**

114. Rather than provide class members with information from any of the expert witnesses retained in the class action, class counsel caused a public relations firm, Defendant Rebuttal PR, to prepare materials addressing class members' concerns about contamination and long-term health consequences.

115. Defendant Rebuttal PR recorded a video of Defendant Carson on or about the week of July 22, 2024. It edited and produced that video.

116. On July 26, 2024, Defendant Wolf of Defendant Rebuttal PR transmitted the edited video by electronic mail to Defendant Graham, copying Defendants Katz, Gomez, and Abney and copying Defendant Carson. The message stated, in substance, that the linked file was the edited version of the video recorded the previous week, and that with Dr. Carson's approval it would be shared at the virtual town hall meeting to be held on Thursday, August 1.

117. Upon forwarding that message, Defendant Abney gave the instruction that the video not be distributed before the town hall.

118. The native video file bears a filename identifying it as a video prepared for Defendant Graham and Defendant Gomez.

119. At the town hall meeting of August 1, 2024, attended by Defendants Graham, Katz, and Gomez, the video was introduced to class members with the representation that Dr. Carson was not involved in the litigation and was a completely independent third party.

### G. What Defendant Carson Told the Class

120. In the video, Defendant Carson identified himself as a medical doctor and a Ph.D. in environmental toxicology whose career had been spent dealing with industrial chemical poisonings and environmental releases.

121. Defendant Carson stated that based on his best judgment there would not be any long-term health impact of chemical exposure from the derailment to community members of East Palestine, and that as far as people living in East Palestine or working there or in nearby neighboring communities, no long term health effects associated with chemical exposure resulting from the derailment were expected.

122. Defendant Carson stated that the levels to which people were exposed in the community were so small that no cancers or other health effects were expected.

123. Defendant Carson stated that the chemical contaminations that have been clearly associated with health effects in communities have been hundreds of times greater than the measured levels then being found in East Palestine from the derailment.

124. Defendant Carson stated that the derailment itself had not contributed to a significant increase of chemicals in East Palestine.

125. Defendant Carson stated that contamination levels would never become greater than they were or had been, and would continue to decrease over time.

126. Defendant Carson stated that although it was too early for some things, it was not too early to predict the overall health effects that would occur, and that it could be predicted that people were going to be safe in the long term.

127. In one passage of the video, Defendant Carson stated that the levels of chemicals were not zero, that the risk due to those exposures was accordingly not zero but was very small,

that it was much smaller than one percent, and that it was so small that it was very difficult to calculate. In the same passage, he stated that he would personally not expect one person to develop a cancer as a result of that exposure.

128. Defendant Carson further published a written set of questions and answers in substantially the same sequence as the questions put to him in the video. That document was posted on the settlement administration website to which class members were directed.

129. In that written document, Defendant Carson stated that none of the detected levels of chemicals from the train derailment were expected to produce long term health effects, and that no increased illness was expected to occur because of chemical exposures from the derailment.

130. In that written document, Defendant Carson stated that hazardous levels of dioxins, furans, polycyclic aromatic hydrocarbons, and polychlorinated biphenyls had not been detected in the environment around East Palestine, and that excesses had not been detected in East Palestine when compared to surrounding communities.

131. The written document did not contain the statements, appearing in the video, that the risk was not zero and that the figure Defendant Carson gave was one he found very difficult to calculate.

## H. The Basis Defendant Carson Did Not Have

132. Defendant Carson identified no data set that he had personally collected, analyzed, or verified.

133. The only data he identified were data generated by government agencies. He stated that a number of agencies had looked at the levels found and compared those to published regulatory limits, and referred generally to groundwater testing by the Ohio Environmental

Protection Agency and air and soil testing by the United States Environmental Protection Agency.

134. As to the one comparison he described in any detail, a comparison of soil results in East Palestine with soil results in another community, he qualified his own statement with the statement that he believed the comparison to have been favorable to the Columbiana community.

135. No cumulative exposure assessment had been performed for the mixture of chemicals to which East Palestine residents were exposed. Defendant Carson performed none.

136. Defendant Carson identified no model, no exposure estimate, and no calculation from which a figure of less than one percent, or a prediction that not one person would develop cancer, could be derived.

137. Defendant Carson is board certified in occupational medicine and in no other specialty. He holds no credential in epidemiology or in risk assessment. His curriculum vitae discloses no peer reviewed publication concerning dioxins, furans, polychlorinated biphenyls, polycyclic aromatic hydrocarbons, vinyl chloride, the exposure of a community to a mixture of chemicals, or cancer risk modeling.

138. In his written questions and answers, Defendant Carson referred to risk assessment experts in the third person, describing how such experts use standard accepted mathematical models to calculate the numbers of cases of specific illnesses expected to occur due to specific chemical exposure intensities and durations. He issued a population level prediction of the kind such a model produces without performing one.

139. Defendant Carson has spent his occupational medicine career in the service of the chemical, petroleum, and pipeline industries, and was the principal investigator of an exposure registry funded by the American Chemistry Council. His curriculum vitae discloses service as

Corporate Medical Director of Chevron Phillips Chemical Company, Medical Director of Employee Health Services at Spectra Energy Corporation and at Enbridge Corporation, Substitute Medical Director at SeaRiver Maritime, consultant physician to Exxon Chemical Americas, and occupational medicine physician at Dow Chemical Company.

140. Defendant Carson was never retained as an expert in the class action. He was never disclosed as an expert witness in the case. He never testified. He was never deposed. His opinions were never subjected to cross-examination or to any challenge to their reliability.

**I. The Expert Whose Findings Were Hidden**

141. Class counsel retained Stephen E. Petty, a professional engineer, certified industrial hygienist, and certified safety professional, as an exposure expert. Upon information and belief, he was first retained by Defendant Simmons Hanly Conroy and later by the other class firms.

142. Mr. Petty has stated under oath that he was hired by plaintiffs' attorneys in the class action, that he possessed independent information regarding contamination, and that he was precluded from providing that information under an obligation of confidentiality.

143. Mr. Petty was never designated as an expert. His findings were never disclosed to the class. In fact, they were initially hidden by Attorney Defendants.

144. Upon information and belief, Mr. Petty's testing showed that between 50 percent and 70 percent of the data points for dioxins or polycyclic aromatic hydrocarbons exceeded screening levels for cancer. Those results were first made public in August and September of 2026.

145. Mr. Petty has stated that the assurances given to class members by Defendant Carson were, in his opinion, at best speculation and at worst simply incorrect, and that those assurances were premature and unsupported by any cited cumulative exposure analyses.

146. Mr. Petty has stated that, to his knowledge, no one had completed a cumulative exposure assessment for individuals exposed to the mixture of chemicals released in East Palestine.

147. At the final approval hearing held on September 25, 2024, class counsel characterized Mr. Petty to the United States District Court as but one voice.

148. Class counsel have since stated in writing that they did not act improperly by requiring Stephen Petty to "keep quiet."

### J. The Statements Concerning Environmental Data

149. At the final approval hearing on September 25, 2024, Defendant Graham stated to the United States District Court that class counsel had a sampling protocol that she and Defendant Katz had negotiated early on with the defendants, that class counsel had adhered to it, that class counsel did not rely on Environmental Protection Agency data, that class counsel had gone out and done their own testing, that class counsel had taken split samples, and that class counsel had eliminated background levels.

150. The only expert declaration class counsel submitted to the United States District Court on the subject of the class's exposure to toxic chemicals was the declaration of Dr. Richard Schuhmann.

151. The Schuhmann declaration compared results against background levels published by the United States Environmental Protection Agency, attributed the presence of dioxins and furans to regional and local combustion processes over time including municipal

waste incineration and residential barrel burning of household waste, cited a publication of the United States Environmental Protection Agency concerning sources of dioxins and furans, and stated that the majority of residential soil samples collected and analyzed for dioxins and furans were below the Environmental Protection Agency background level for East Palestine.

152. Plaintiffs allege that class counsel's representation that they did not rely on Environmental Protection Agency data cannot be reconciled with the only expert declaration they submitted on the question.

## K. What Class Counsel Knew

153. On August 21, 2024, 20 days after the video was shown to class members and 35 days before the final approval hearing, class counsel, with the knowledge of Attorney Defendants, signed and submitted an Extraordinary Injury Claim Statement on behalf of a class member.

154. That statement recited that the class member had undergone pulmonary function testing with methacholine challenge at the Cleveland Clinic, that the Director of the Occupational Lung Disease Program at the Cleveland Clinic had diagnosed the class member with moderate persistent reactive airways dysfunction syndrome, that the physician had opined that the condition was caused by the class member's exposure to the contaminants released by the derailment, and that the Cleveland Clinic physician was prepared to testify to that causation.

155. That class member executed his personal injury release on August 21, 2024, the same day.

156. Within 20 days of the video, and 35 days before the final approval hearing, class counsel signed a statement reciting a physician's opinion, attributing a diagnosed and moderate persistent respiratory injury in a class member to the derailment, based on testing performed at

the Cleveland Clinic. Class counsel and Attorney Defendants were in possession of that physician's opinion, or of the substance of it, at the time Defendant Carson told class members that no long term health effects were expected and that not one person would be expected to develop cancer.

## L. The Fee

157. On September 27, 2024, the United States District Court granted final approval of the settlement and awarded class counsel $162,000,000 in fees, representing 27 percent of the fund, together with approximately $18,000,000 in expenses.

158. Section XIV.D of the Settlement Agreement provided that the fee award would be paid from the settlement fund into escrow within 14 days after the grant of final approval and wired from the escrow account to an account number identified by class counsel.

159. By contrast, no distribution could be made to a class member until after the Effective Date, defined as one business day after the later of the expiration of the time to appeal, the completion of all appellate proceedings affirming the judgment, or the final dismissal of any appeal or petition for certiorari.

160. The fee award was divided among 39 law firms. The authority to divide the award among all of the firms was given to class counsel, the three primary law firms representing the class. The allocation was announced as finalized 10 days after final approval. Payments to other firms began four days later.

161. Judge Amul Thapar of the United States Court of Appeals for the Sixth Circuit, concurring separately in the appeal from the fee award, observed that while the plaintiffs waited, the lawyers were paid in full; that provisions of that kind improperly align incentives between counsel and their clients, create an appearance of unfairness that reflects poorly on the legal

system, and enable gamesmanship by class counsel; that lead counsel acts in its own interest when allocating money between firms; and that the district court had granted sole discretion to class counsel to allocate fees within two weeks of the final settlement without seeing its methodology, checking its math, or laying eyes on its proposed awards, with the result that even at the time of the opinion it was not known who got what, when, and why. Judge Thapar closed with the observation that victims deserve better.

### M. What Plaintiffs Received

162. The value of a point under the plan of distribution was represented to be $250, yielding $25,000 for a base case of 100 points.

163. In fact, the value ultimately applied was approximately half of the represented figure, and the average personal injury payment was materially less than the amount represented to class members in their respective distance categories.

164. The reduction occurred because the volume of claims that the increased figure produced exceeded the money allocated to pay them. Attorney Defendants were the cause of this circumstance.

165. The releases were not conditioned on the receipt of any particular amount, and they were irrevocable when signed.

166. The class members who elected the personal injury component in reliance on the represented figures are the same class members whose recovery was reduced because other class members did the same. East Palestine deserved better.

### N. What Has Happened Since

167. Beginning in February 2026, class members who had executed personal injury releases began receiving payments materially below the amounts represented to them.

168. In August and September of 2026, the testing data developed by the exposure expert retained by class counsel was made public for the first time.

169. Several Plaintiffs have since been diagnosed with serious illnesses, including cancer. Several have received a few hundred dollars for their personal injury claims.

170. Research published after the releases were executed has reported findings inconsistent with the assurances given to the class by class counsel, Attorney Defendants, and the other Defendants herein. A study by researchers at Kent State University and other institutions, published in the journal Environmental Science: Processes and Impacts, in February 2025, analyzed 27 soil samples collected within two miles of the derailment site in August 2023 and reported that 48 percent of those samples exceeded Environmental Protection Agency cancer risk regional screening levels for dioxin.

171. Each Plaintiff who develops a disease attributable to the derailment has no remedy against Norfolk Southern. That remedy was extinguished by the release each Plaintiff signed at the behest of the Defendants herein.

## VI. TIMELINESS

172. Each Plaintiff brings this action within the period allowed by law.

173. R.C. § 2305.11(A) requires that an action upon a legal malpractice claim be commenced within one year after the cause of action accrued. As to any claim governed by that section, the cause of action accrued upon the later of a cognizable event by which that Plaintiff discovered or should have discovered that the injury was related to the act or omission of the Attorney Defendants, or the termination of the attorney-client relationship for the undertaking in question. No cognizable event occurred before the payments described above began in February

2026, nor before the testing data of the exposure expert retained by class counsel was made public in August and September of 2026.

174. No Defendant ever communicated to any Plaintiff that the representation had ended. No Defendant ever advised any Plaintiff to seek other counsel, ever advised any Plaintiff that Plaintiff might have a claim against the Defendant, or ever took any step that would dispel a reasonable client's belief that the representation continued. The date of termination and of the cognizable event is a question of fact.

175. The conduct alleged in this Complaint was intentionally concealed from Plaintiffs by Defendants. The communication of July 26, 2024 among the public relations firm, class counsel, and Defendant Carson was not public. The findings of the exposure expert retained by class counsel were not public and were subject to a confidentiality obligation that class counsel enforced. The internal communications concerning the increase from $10,000 to $25,000 were not public. All of this was hidden from the very people the class action was intended to help.

176. A fiduciary who remains silent where there is a duty to disclose conceals. Defendants are estopped from asserting the passage of time as a defense to conduct they concealed.

177. As to the claims sounding in fraud, R.C. § 2305.09(C) provides a period of four years, and the cause of action does not accrue until the fraud is discovered.

178. As to the claim for conversion, R.C. § 2305.09(B) provides a period of four years, and the cause of action does not accrue until the wrongdoer is discovered.

179. R.C. § 2305.117(B) bars an action upon a legal malpractice claim commenced more than four years after the act or omission constituting the alleged basis of the claim, except as to persons within minority or of unsound mind under R.C. § 2305.16. The conduct on which

Plaintiffs' claims against the Attorney Defendants principally rest occurred between July and September of 2024. This action is commenced within four years of that conduct.

180. Plaintiffs who were minors at the time of the conduct alleged are expressly excepted from R.C. § 2305.117(B). As to every claim to which R.C. § 2305.16 applies by its terms, those Plaintiffs are entitled to its protection. As to any claim to which R.C. § 2305.16 does not apply by its terms, Plaintiffs rely upon the accrual and discovery allegations set forth *supra*.

181. R.C. § 2305.117, by its terms reaches only an attorney, a law firm, or a legal professional association, and has no application to the non-attorney Defendants.

## VII. INDIVIDUAL TREATMENT AND RESERVED ALLEGATIONS

182. Plaintiffs bring this action individually and not on behalf of any class.

183. The claims pleaded here are not susceptible of class treatment, and Plaintiffs do not seek it. Each claim turns on what a particular Plaintiff was told, by whom, in what medium, and on what date; on what that Plaintiff understood; on whether and to what extent that Plaintiff relied; on the distance category in which that Plaintiff resided and the figure represented to that Plaintiff; on the date that Plaintiff executed a release; on what that Plaintiff received; and on the nature and extent of that Plaintiff's injury.

184. Plaintiffs further allege that the conduct described in this Complaint was not a single act. It was a course of conduct extending from the solicitation campaign of 2023 through the payments of 2026, related in purpose, in result, in participants, and in method of commission. These facts are pleaded in support of Plaintiffs' allegations of malice and of civil conspiracy.

## VIII. CAUSES OF ACTION

### COUNT I

### LEGAL MALPRACTICE

**(Against the Attorney Defendants)**

185. Plaintiffs incorporate Paragraphs 1 through 184 of this Complaint as if fully rewritten.

186. The Attorney Defendants owed Plaintiffs the duty to act as a reasonably prudent attorney would under similar circumstances.

187. The Attorney Defendants breached that duty in several ways, including, but not limited to: They failed to disclose to Plaintiffs the findings of the exposure expert they had retained. They caused a public relations firm to produce and disseminate to Plaintiffs the opinions of a person who was presented as independent and who was not. They failed to correct the representation that the person was independent. They failed to disclose to Plaintiffs the conflict between their own interest in a fee payable within 14 days and Plaintiffs' interest in a fully informed decision. They represented to Plaintiffs a payment figure that the allocated funds could not support. They declined to correct release forms they knew to be inaccurate. They permitted Plaintiffs to release claims for latent disease without disclosing the information reasonably necessary to permit an informed decision.

188. The Attorney Defendants acted for their own benefit. The settlement could be terminated if the rate of participation fell below undisclosed thresholds. The fee depended on the settlement. The participation depended on persuading Plaintiffs that they were not at risk.

189. As a direct and proximate result, Plaintiffs were injured. A fee was taken, from the fund created for their benefit and out of the recovery that would otherwise have been available to them, by lawyers who did not discharge the duties for which it was taken. Plaintiffs

lost the opportunity to decline the personal injury component and to preserve their claims. Plaintiffs lost the opportunity to make an informed decision. But for, and as a proximate result of, the negligent and tortious conduct of the Attorney Defendants they would not have executed the releases and would have retained the claims those releases extinguished.

190. Each Plaintiff has been injured in excess of $25,000.00 in an amount to be proven at trial.

**COUNT II**

**BREACH OF FIDUCIARY DUTY**

**(Against the Attorney Defendants)**

191. Plaintiffs incorporate Paragraphs 1 through 190 of this Complaint as if fully rewritten.

192. A fiduciary relationship existed between each Plaintiff and Attorney Defendants as a matter of fact and law.

193. Attorney Defendants owed Plaintiffs the duties of undivided loyalty, of candor, and of full disclosure.

194. The Attorney Defendants breached these duties by conduct that lay outside the ordinary conduct of a representation. They retained a public relations firm to produce and disseminate false health assurances to their own clients. They presented a person to their own clients as an independent third party when he was not. They enforced a confidentiality obligation against their own retained expert while amplifying a contrary voice. They negotiated and accepted a fee structure that paid them in full within 14 days while their clients waited years. They divided that fee among themselves without disclosure of the methodology by which it was divided.

195. Each of those breaches was undertaken for the personal gain of Attorney Defendants. The fee was $162,000,000, together with approximately $18,000,000 in expenses. It was payable into escrow within 14 days of final approval, at a time when no class member could be paid anything. Its division among 39 firms was committed to the discretion of the three firms with the largest share. And the settlement on which all of it depended could be terminated by Norfolk Southern if too few class members signed the releases that Attorney Defendants were advising them to sign.

196. As a direct and proximate result, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

197. The actions and omissions of Attorney Defendants demonstrate actual malice, entitling Plaintiffs to punitive damages upon proof by clear and convincing evidence and upon an award of compensatory damages, and to attorney fees upon an award of punitive damages.

198. Plaintiffs are further entitled to an accounting of the fees received by the Attorney Defendants and of the allocation of the fee award among them. The Attorney Defendants alone possess the records of that allocation. A judge of the United States Court of Appeals for the Sixth Circuit, concurring in the appeal from the fee award, observed that it remains unknown who received what, when, and why. Plaintiffs seek no accounting of the settlement fund itself.

**COUNT III**

**FRAUD**

**(Against the Attorney Defendants, Defendant Carson, and Defendant Environmental Medicine Consultants)**

199. Plaintiffs incorporate Paragraphs 1 through 198 of this Complaint as if fully rewritten.

200. The representations made by Defendants to Plaintiffs included the statement, made at the town hall meeting of August 1, 2024, that Defendant Carson was not involved in the

litigation and was a completely independent third party; the statements by Defendant Carson in the video played at that meeting concerning the absence of long term health effects, the absence of expected cancers, and the safety of the community in the long term; the statements in Defendant Carson's written questions and answers published on the settlement administration website; and the representations made in the pamphlets distributed in East Palestine, at the settlement center, and at the town hall concerning the amount that class members would receive in exchange for their releases.

201. The facts concealed by Defendants from Plaintiffs included the retention of the exposure expert and his findings; the role of Defendant Rebuttal PR in producing, editing, and timing the video, and the approval of that video by class counsel before it was shown; the existence of the confidential termination thresholds; and the fact that class counsel possessed a physician's opinion attributing a diagnosed injury in a class member to the derailment.

202. Each representation and each concealment was material to Plaintiffs' decisions whether to execute the releases.

203. Each representation was made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it was true or false that knowledge may be inferred.

204. Each representation and concealment was made with the intent of inducing Plaintiffs to execute personal injury releases, and to not opt out of the property settlement.

205. The Attorney Defendants owed Plaintiffs a fiduciary duty, and that duty gave rise to a duty to disclose the facts concealed. Defendant Carson, having undertaken to address Plaintiffs on the subject of their health in a forum convened for them and through the channel by which their own counsel communicated with them, was under a duty not to convey a half truth,

and in particular was under a duty to disclose that he had been recruited and recorded at the insistence of the very counsel who presented him as independent of them.

206. Plaintiffs justifiably relied upon the foregoing. Plaintiffs were lay persons. The persons speaking to them were their own lawyers and a physician presented to them as independent. Plaintiffs had no access to the expert findings that were withheld and no means of learning that the video had been produced by a public relations firm at counsel's direction.

207. As a direct and proximate result of that reliance, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

208. The actions and omissions of Defendants demonstrate actual malice, or in the alternative, aggravated or egregious fraud, entitling Plaintiffs to punitive damages upon proof by clear and convincing evidence and upon an award of compensatory damages, and to attorney fees upon an award of punitive damages.

## COUNT IV

## FRAUDULENT INDUCEMENT

**(Against the Attorney Defendants, Defendant Carson, and Defendant Environmental Medicine Consultants)**

209. Plaintiffs incorporate Paragraphs 1 through 208 of this Complaint as if fully rewritten.

210. Each Plaintiff was induced to execute a personal injury release, and to not opt out of the property resolution, by the conduct, representations, and concealments described in this Complaint.

211. Certain of the representations concerned matters of existing fact, namely whether the physician addressing the class was independent of counsel, what the environmental testing then in the possession of class counsel showed, whether an exposure expert had been retained and what he had found, whether any cumulative exposure assessment had been performed,

whether the physician had himself performed the analysis his conclusions required, and what payment the plan of distribution provided. Certain further representations were expressions of opinion and of prediction. As to those, Plaintiffs allege that they were made by a person who knew, and by lawyers who knew, that no analysis supporting them had been performed, and that a prediction offered as the product of expertise, by a speaker who has done none of the work the prediction requires, is a misrepresentation of existing fact as to the basis on which it rests.

212. Defendants made those representations, and withheld the facts described in this Complaint, for the purpose of inducing Plaintiffs to execute the releases.

213. Plaintiffs executed the releases in reliance and would not have executed them had the withheld facts been disclosed.

214. Plaintiffs do not seek rescission herein. Plaintiffs seek damages for the injury caused by the fraudulent procurement of their settlement of their claims.

215. As a direct and proximate result, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

216. The actions and omissions of Defendants demonstrate actual malice, or in the alternative, aggravated or egregious fraud, entitling Plaintiffs to punitive damages upon proof by clear and convincing evidence and upon an award of compensatory damages, and to attorney fees upon an award of punitive damages.

**COUNT V**

**CONSTRUCTIVE FRAUD**

**(Against the Attorney Defendants)**

217. Plaintiffs incorporate Paragraphs 1 through 216 of this Complaint as if fully rewritten.

218. A confidential and fiduciary relationship existed between Plaintiffs and the Attorney Defendants.

219. Within that relationship, the Attorney Defendants obtained an advantage over Plaintiffs. They obtained a fee payable within 14 days, secured by the participation of class members whose participation they procured through false and incomplete disclosure.

220. The conduct described in this Complaint constitutes a breach of a legal and equitable duty which, irrespective of any intent to deceive, the law regards as fraudulent because of its tendency to deceive, to violate confidence, and to injure those whom the Attorney Defendants were bound to protect.

221. Plaintiffs reposed confidence in the Attorney Defendants, relied upon the completeness and the candor of what the Attorney Defendants told them, and executed their releases upon that reliance. Plaintiffs would not have executed them had the facts withheld been disclosed.

222. As a direct and proximate result, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

**COUNT VI**

**NEGLIGENT MISREPRESENTATION**

**(Against Defendant Carson and Defendant Environmental Medicine Consultants)**

223. Plaintiffs incorporate Paragraphs 1 through 222 of this Complaint as if fully rewritten.

224. Defendant Carson supplied information to Plaintiffs in the course of his profession as set forth in Paragraphs 121 through 131, *supra*. His curriculum vitae describes him as a frequent consultant to governments, corporations, and the legal community on matters related to industrial chemical exposure, toxicology, and environmental justice. Defendant Carson supplied that information in a transaction in which he had a pecuniary interest, in that, upon information and belief, he received or expected to receive payment and professional benefit from the role, including the production of a professionally recorded presentation at the expense of class counsel's public relations firm and the standing that attends being presented to a community as the physician on whose word it might rely.

225. Defendant Carson stood in a relationship to Plaintiffs beyond that of parties dealing at arm's length. He was presented to them as an independent physician speaking to their health, in a forum convened for them, through the channel by which their own counsel communicated with them, on the question they were then deciding.

226. The information Defendant Carson conveyed was false.

227. Defendant Carson failed to exercise reasonable care or competence in obtaining or communicating that information. He performed no cumulative exposure assessment. He analyzed no data himself. He identified no reliance materials. He spoke outside the field in which he holds board certification. He issued a population level prediction without performing the analysis such a prediction requires. By definition, this conduct was unreasonable.

228. Each Plaintiff justifiably relied on that information and suffered pecuniary loss as a direct and proximate result, in excess of $25,000.00 in an amount to be proven at trial.

**COUNT VII**

**CIVIL CONSPIRACY**

**(Against All Defendants)**

229. Plaintiffs incorporate Paragraphs 1 through 228 of this Complaint as if fully rewritten.

230. Defendants combined maliciously with one another for the common purpose of inducing class members to execute personal injury and property releases in numbers sufficient to secure the settlement and the fee that depended upon it.

231. The combination is evidenced by the communication of July 26, 2024 among the public relations firm, four members of class counsel, and Defendant Carson; by the instruction that the video not be distributed before the town hall; by the coordinated presentation of the video at a meeting convened for class members; by the publication of the written questions and answers on the settlement administration website; and by the coordinated distribution of the revised payment figures.

232. The conspiracy caused the commission of unlawful acts independent of the conspiracy itself. Those acts are the fraudulent misrepresentations and concealments set forth, *supra*, and incorporated herein, made to induce Plaintiffs to execute releases of their personal injury and property claims; the fraudulent inducement of those releases; the breach by the Attorney Defendants of the fiduciary duties they owed to Plaintiffs; and the criminal acts described, *infra*, namely telecommunications fraud in violation of R.C. § 2913.05(A) and the securing of writings by deception in violation of R.C. § 2913.43, all of which are incorporated herein. Plaintiffs plead those acts as independent unlawful acts, and not merely by reference.

233. The overt acts in furtherance of the conspiracy include the production and editing of the video, its transmission on July 26, 2024, its presentation on August 1, 2024, the publication of the written questions and answers, the distribution of the pamphlets, and the refusal to correct the release forms.

234. The combination alleged is a combination among lawyers of separate and independent law firms, and between those lawyers and the Defendants who are not lawyers, and not a combination between a firm and its own principals or employees. Each Defendant is liable for the acts of every other Defendant undertaken in furtherance of the common design.

235. As a direct and proximate result, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

236. The actions and omissions of Defendants demonstrate actual malice entitling Plaintiffs to punitive damages upon proof by clear and convincing evidence and upon an award of compensatory damages, and to attorney fees upon an award of punitive damages.

## COUNT VIII
## LIABILITY FOR CRIMINAL ACTS
## (R.C. § 2307.60)

237. Plaintiffs incorporate Paragraphs 1 through 236 of this Complaint as if fully rewritten.

238. R.C. § 2307.60(A)(1) provides that anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law. A civil action under that section does not require an underlying criminal conviction.

239. Defendants committed criminal acts that directly and proximately caused injury to Plaintiffs, specified as follows.

240. Telecommunications fraud, R.C. § 2913.05(A). Defendants, having devised a scheme to defraud, knowingly disseminated, transmitted, or caused to be disseminated or transmitted by means of a wire, telecommunication, telecommunications device, telecommunications service, or voice over internet protocol service writings, data, pictures, sounds, and images with purpose to execute and further that scheme. This specification is pleaded against all Defendants. The transmissions are the virtual town hall conducted on August 1, 2024, at which the video was played to class members; the subsequent posting of the recording of that town hall to a public video platform; and the publication of Defendant Carson's written questions and answers on the settlement administration website. Defendant Rebuttal PR and Defendant Wolf caused each of those transmissions to be made, in that they recorded, edited, produced, and delivered the video for the purpose of its presentation at the town hall and its subsequent publication, and they did so knowing the purpose for which it was to be used. Plaintiffs further plead the electronic mail message of July 26, 2024, by which the edited video was circulated, not as a transmission that reached any Plaintiff, but as evidence of the scheme that the transmissions above were made to execute.

241. Each of those transmissions was made with purpose to execute or otherwise further the scheme to defraud, which is the culpable mental state R.C. § 2913.05(A) requires.

242. Securing writings by deception, R.C. § 2913.43. This specification is pleaded against all Defendants. Defendants, by deception, caused Plaintiffs to execute writings, namely the personal injury and property releases, which disposed of property, and did so with purpose to defraud.

243. Theft by deception, R.C. § 2913.02(A)(3). This specification is pleaded against the Attorney Defendants. Each of the Attorney Defendants, with purpose to deprive Plaintiffs of

property, knowingly obtained or exerted control by deception over property of Plaintiffs, namely each Plaintiff's claim against Norfolk Southern Railway Company for personal injury and property damage arising from the derailment, which was the property of that Plaintiff, which had value, and which the Attorney Defendants obtained the surrender of by the deception described in this Complaint.

244. Complicity, R.C. § 2923.03. This specification is pleaded against all Defendants. The principal offenses specified above were in fact committed. Each Defendant, acting with the culpability required for the commission of those offenses, solicited or procured another to commit them, or aided and abetted another in committing them. A person who violates R.C. § 2923.03 is to be punished as if a principal offender, and it is no defense that no other person has been convicted.

245. As a direct and proximate result of those criminal acts, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

246. The actions and omissions of Defendants demonstrate actual malice, entitling Plaintiffs to punitive damages upon proof by clear and convincing evidence and upon an award of compensatory damages, and to attorney fees upon an award of punitive damages.

**COUNT IX**

**CIVIL LIABILITY FOR A THEFT OFFENSE**

**(R.C. § 2307.61, Against the Attorney Defendants)**

247. Plaintiffs incorporate Paragraphs 1 through 246 of this Complaint as if fully rewritten.

248. R.C. § 2913.01(K)(1) defines a theft offense to include a violation of R.C. § 2913.02, R.C. § 2913.05, and R.C. § 2913.43. R.C. § 2913.01(K)(4) defines a theft offense to include complicity in committing any such offense.

249. The offenses specified in the preceding Count are theft offenses within the meaning of R.C. § 2913.01(K).

250. At the time of the conduct alleged, each Plaintiff was the owner of, and entitled to possession of, that Plaintiff's claim against Norfolk Southern Railway Company for personal injury and property damage arising from the derailment, including claims for diseases that had not then manifested. That claim was property. It was the subject of the theft offenses specified in the preceding Count, and it was obtained from each Plaintiff by deception.

251. Pursuant to R.C. § 2307.61(A)(1)(a), Plaintiffs seek compensatory damages, including the value of the property, together with liquidated damages as provided by that division.

252. In the alternative, and pursuant to R.C. § 2307.61(A)(1)(b), Plaintiffs elect to recover liquidated damages in whichever is greater of two hundred dollars or three times the value of the property at the time it was the subject of the theft offense.

253. Pursuant to R.C. § 2307.61(G)(1), the trier of fact may determine that the property was the subject of a theft offense regardless of whether any person has been convicted of any offense.

254. Each Plaintiff seeks the personal liability of the Attorney Defendants for the property they wrongfully obtained. Plaintiffs do not seek to vacate, reallocate, or reopen any order of any other court, and no relief sought in this Count runs against the settlement fund.

## COUNT X

## UNJUST ENRICHMENT AND DISGORGEMENT

**(Against the Attorney Defendants)**

255. Plaintiffs incorporate Paragraphs 1 through 254 of this Complaint as if fully rewritten.

256. Plaintiffs conferred a benefit upon the Attorney Defendants. The claims of Plaintiffs and of the other class members, and the releases those persons gave, were what produced the fund and the fee that was measured as a percentage of it. Every dollar of that fee came out of money that had been assembled to compensate the class and reduced by that amount what remained for the class.

257. The Attorney Defendants knew of that benefit.

258. It would be unjust to permit the Attorney Defendants to retain that benefit. The fee was purportedly earned, and the settlement on which it depended was secured, through the conduct described in this Complaint.

259. Each Plaintiff seeks restitution and disgorgement of the benefits so obtained, from the Attorney Defendants personally, in excess of $25,000.00 in an amount to be proven at trial. Plaintiffs do not seek any relief against the settlement fund.

## COUNT XI

## CONVERSION

**(Against the Attorney Defendants)**

260. Plaintiffs incorporate Paragraphs 1 through 259 of this Complaint as if fully rewritten.

261. Each Plaintiff was the owner of, and entitled to possession of, the personal injury and property claim that Plaintiff released. It was identifiable, it was that Plaintiff's alone, and it had value. Demand upon the Attorney Defendants would be futile, in that they have maintained

throughout, and maintain in the proceedings described above, that they are entitled to retain everything they received.

262. The Attorney Defendants, by the deception described in this Complaint, exercised dominion over that property to the exclusion of and inconsistent with the rights of Plaintiffs. Plaintiffs do not allege that any Defendant drew from the settlement fund any sum that the orders of the issuing court did not permit. Plaintiffs allege that what the Attorney Defendants obtained, they obtained by deceiving the persons whose property it was.

263. As a direct and proximate result, each Plaintiff was injured in excess of $25,000.00 in an amount to be proven at trial.

264. Plaintiffs seek the personal liability of the Attorney Defendants for the property they wrongfully obtained. Plaintiffs do not seek to vacate, reallocate, or reopen any order of any other court, and no relief sought in this Count runs against the settlement fund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants, jointly and severally, and seek all legal and equitable relief allowed by law, including compensatory damages in excess of $25,000.00 in an amount to be proven at trial; liquidated damages pursuant to R.C. § 2307.61; punitive and exemplary damages; restitution, disgorgement, and forfeiture of fees, against Defendants personally; an accounting; attorney fees, costs, and expenses of suit; pre-judgment and post-judgment interest; and all other relief this Court deems just and proper.

Respectfully submitted,

JASON D. WINTER (0076191)
COURTNEY J. TRIMACCO (0082816)
WINTER | TRIMACCO CO., LPA
950 Main Avenue, Suite 1210
Cleveland, Ohio 44113
P: 216.675.3300
F: 216.472.8706
Jason@wintertrimacco.com
Courtney@wintertrimacco.com

*Attorneys for Plaintiffs*

**JURY DEMAND**

Plaintiffs hereby each demand a separate trial by jury, comprised of the maximum number of jurors allowed by law, upon all claims and issues so triable.

JASON D. WINTER (0076191)
COURTNEY J. TRIMACCO (0082816)
WINTER | TRIMACCO CO., LPA
950 Main Avenue, Suite 1210
Cleveland, Ohio 44113
P: 216.675.3300
F: 216.472.8706
Jason@wintertrimacco.com
Courtney@wintertrimacco.com

*Attorneys for Plaintiffs*